**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| Tyler Stricker, on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **PLAINTIFF TYLER STRICKER'S CLASS ACTION COMPLAINT** |
| The Christian Broadcasting Network, Inc., | |
| Defendant. | |

Plaintiff Tyler Stricker, individually and on behalf of all other similarly situated persons ("Plaintiff"), brings this action against Christian Broadcasting Network ("Defendant") for its violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiff's claims arise from Defendant's practice of knowingly disclosing to a third party, Meta Platforms, Inc. (formerly known as Facebook) ("Meta"), "personally identifiable information" which identifies the videos Plaintiff and similarly situated subscribers request or obtain from Defendant's websites, https://www2.cbn.com,[1] https://secure.cbn.com/partners/video, https://www.cbnfilms.com/, https://us-en.superbook.cbn.com/ (the "Websites"). Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## NATURE OF THE CASE

1.      Plaintiff brings this consumer privacy class action against Defendant for its violations of the VPPA by disclosing its subscribers' PII to Meta – specifically, Defendant disclosed its subscribers' identities alongside the video materials they requested or obtained from Defendant's Websites.

2.      The VPPA prohibits "video tape service providers," such as Defendant, from "knowingly disclos[ing]" consumers' personally identifiable information ("PII"), defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

3.      Defendant violates the VPPA by disclosing to Meta the specific videos its subscribers request or obtain. Defendant discloses this information to Meta using the Meta Pixel

---

[1] Plaintiff's claims include not only the root website https://www2.cbn.com/, but also any page including the root (i.e., https://www2.cbn.com/700club).

(formerly known as the Facebook Pixel) ("Pixel")— a snippet of programming code Defendant purposefully installed across its Websites that transmits PII to Meta. The information Defendant shares with Meta includes the subscriber's Facebook ID ("FID") coupled with the title of the video that the subscriber requests or obtains from the Websites.

4.      Defendant discloses its subscribers' FIDs and the content they request or obtain to Meta together in a single transmission. Because a subscriber's FID uniquely identifies his or her Facebook profile, Meta can use the FID to quickly and easily view a particular subscriber's corresponding Facebook profile. In the simplest terms, the Pixel installed by Defendant captures and discloses to Meta the videos a subscriber requests or obtains from Defendant's Websites. In the present matter, the information transmitted to Meta includes personal information about an individual's search for guidance regarding their religious faith, their mental health, and their marital or parental relationships.

5.      Plaintiff and Class Members have suffered injury from Defendant's conduct. These injuries include: (i) loss or diminished value of PII; (ii) damage to their interest in controlling their personal information or preventing the unauthorized exploration of their private lives (by Defendant's hand and to its economic benefit); and (iii) the continued and heightened risk of the security of their PII, which is transmitted via unencrypted network traffic.

6.      On behalf of himself and all similarly situated subscribers of Defendant, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of subscribers' PII; awarding liquidated damages in the amount of $2,500 per violation, attorneys' fees, and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

**PARTIES**

7.      Plaintiff Tyler Stricker lives and is domiciled in Saginaw, Michigan and is a consumer who subscribes to Defendant's Websites. He requests or obtains video content on the Websites using his Internet-connected device and web-browsing software installed on that device ("Browser").

8.      Defendant, The Christian Broadcasting Network, Inc., is a Virginia Corporation headquartered at 977 Centerville Turnpike, Virginia Beach, VA 23463 and operates the Websites, through which it collects the PII of its subscribers and discloses their PII to third parties including Meta. Defendant is "engaged in the business…of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," and accordingly falls within the VPPA's definition of "video tape service provider." 18 U.S.C. § 2710(a)(4).

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over Defendant because it is incorporated and has its principal place of business in Virginia.

10.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

11.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

## COMMON FACTUAL ALLEGATIONS

### I.      Background of the VPPA

12.     The VPPA prohibits "a video tape service provider," from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1).

13.     The VPPA was passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase, and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599, at 7-8 (1988).

14.     The First Circuit explained the historical foundation as follows, "Congress enacted the VPPA in response to a profile of then-Supreme Court nominee Judge Robert H. Bork that was published by a Washington, D.C., newspaper during his confirmation hearings. S. Rep. No. 100–599, at 5 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342–1. The profile contained a list of 146 films that Judge Bork and his family had rented from a video store. *Id.* Members of Congress denounced the disclosure as repugnant to the right of privacy. *Id.* at 5–8. Congress then passed the VPPA "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 485 (1st Cir. 2016).

15.     The Washington City Paper article entitled *The Bork Tapes*, was an intrusive rental-by-rental recitation of Judge Bork's video history. Foreshadowing the coming privacy concerns facing Americans today, reporter Michael Dolan offered the following chilling comment: "[t]he only way to figure out what someone is like is to examine what that someone likes — take a hard look at the tools of leisure he uses to chip away life's rough edges." Recent commentators have described the insidious nature of what was previously considered relatively benign information:

> The article attempted to reconstruct the interior life of a U.S. Supreme Court nominee…The list of 146 videotapes Judge Bork had rented over the course of two years, leaked by a store clerk, revealed nothing particularly salacious. Judge Bork favored Alfred Hitchcock films, spy thrillers, and British costume dramas; someone in the Bork household had an affinity for John Hughes movies. The

> list's disclosure hardly intruded upon the sphere of intimate and domestic life protected from government intrusion by *Griswold v. Connecticut* and its progeny. Yet, against the backdrop of '[o]ne of the fiercest battles ever waged over a Supreme Court nominee,' the publication of *The Bork Tapes* drew bipartisan ire and generated consensus on the importance of intellectual privacy."

The Harvard Law Review Association*, Chapter Three the Video Privacy Protection Act as a Model Intellectual Privacy Statute*, 131 Harv. L. Rev. 1766, (2018) (discussing the Video Privacy Protection Act's effect on privacy legislation).

16.    While the concerns about privacy were undoubtedly true in 1988 when the VPPA was passed, the importance of privacy legislation in the modern era of data mining is even more pronounced. Indeed, during a 2012 Senate Judiciary Committee meeting entitled "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Patrick Leahy emphasized that, "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[2]

17.    The privacy rights protected by the VPPA bear a close relationship to the traditional privacy harms actionable in English and American courts, including, "for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425, 141 S. Ct. 2190, 2204, 210 L.Ed. 568 (2021). Here, Plaintiff alleges

---

[2] Full Committee Hearing, *The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law*, U.S. Senate Committee on the Judiciary, (January 31, 2012), https://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited January 30, 2024).

harm associated with the nonconsensual sharing of his private information, an act constituting an invasion of privacy that is highly offensive to a reasonable person.[3] *Id.*

18.     Simply put, the right to privacy in the videos one requests or obtains is inviolate. While the privacy protections afforded to Americans are a hodgepodge of state and federal common and statutory law, the VPPA is a unique and express protection deemed vital to the First Amendment.

**II.     The Pixel is Designed to Collect Information from Users.**

19.     The Pixel is a unique string of code that operates to share subscribers' online activity[4] with Meta, which Meta uses to create unique, detailed profiles filled with highly personal inferences about the subscribers, such as their "interests," "behavior," and "connections."[5]

20.     After users' activity is transmitted to Meta via the Pixel, Meta compiles the information to identify personalized "audiences" that consist of individuals who are likely to respond to particular advertisers' messaging, improving the ability of businesses to serve specific (i.e., "targeted") subscribers with personalized advertisements. This improves the accuracy and effectiveness of a business's advertising campaigns.

---

[3] *See also* Restatement (Second) of Torts § 652A (Am. Law Inst. 1977) ("Restatement") "[o]ne who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other." Restatement § 652A(1); Steve Warren, *'A Terrifying Precedent': Calvary Chapel Sues CA County for Tracking Attendance of Churchgoers*, CBN NEWS (2023) https://www2.cbn.com/news/us/terrifying-precedent-calvary-chapel-sues-ca-county-tracking-attendance-churchgoers.
[4] Meta, *Meta Pixel*, Meta for Developers (2024) https://developers.facebook.com/docs/meta-pixel/ (last visited January 30, 2024); Meta, *Retargeting: Inspire People to Rediscover What They Love About Your Business*, Meta for Developers (2024) https://www.facebook.com/business/goals/retargeting (Meta Pixel "tracks the people [who visit your website] and the type of actions they take.") (last visited January 30, 2024).
[5] Meta, *Audience Ad Targeting: How to find people most likely to respond to your ad,* Meta for Developers (2024), https://www.facebook.com/business/ads/ad-targeting (last visited January 30, 2024).

21.     Moreover, the Pixel can recognize Defendant's subscribers even when they visit different websites across the Internet - and even after a subscriber clears his or her browser history.

22.     Information about a website's users becomes the currency by which Meta and said websites exchange value;[6] websites provide information to Meta, and in exchange, Meta provides unmatched advertising capabilities to Defendant. Meta promotes its pixel to be used to "[f]ind new customers…Drive more sales…[and] reach people who are more likely to take an action you care about, like making a purchase."[7] In fact, it is this very business model that contributed to Meta's _over $40 billion_ advertising revenue in 2023.[8]

### III.     Defendant Designed Its Websites to Disclose Users' PII To Meta.

23.     Defendant operates its Websites in the U.S., accessible from a computer browser at https://www2.cbn.com, https://secure.cbn.com/partners/video, https://www.cbnfilms.com/, and https://us-en.superbook.cbn.com/. When Defendant developed its Websites it purposefully installed and programmed the Pixel into its Websites' operation, thus making the knowing choice to share subscribers' PII with Meta.[9]

---

[6] _See_ Ben-Shahar, Omri, _Privacy is the New Money, Thanks to Big Data_, Forbes, https://www.forbes.com/sites/omribenshahar/2016/04/01/privacy-is-the-new-money-thanks-to-big-data/?sh=2229e4853fa2 (last visited Feb. 6, 2024) ("We don't pay old money to use Facebook, Google search, CNET, or Forbes.com. Instead, each of these websites competes for our New Money currency—collecting mountains of information about us when we use their services, and commercializing their databases.").

[7] Meta, _About Meta Pixel_, Meta Business Help Center (2024). https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited March 18, 2024).

[8] Meta, _Meta Reports Fourth Quarter and Full Year 2023 Results_, Meta Investor Relations, https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend/default.aspx#:~:text=For%20the%20full%20year%202023,and%20full%20year%202023%2C%20respectively. (last visited Feb. 2, 2024).

[9] Similar to the FID, which identifies a particular Facebook profile, pixels also possess their own unique numeric identifiers. The numerical identifiers associated with the Meta Pixels which

24.    A Pixel does not appear within a website merely by happenstance, indeed, to do so required Defendant to follow detailed instructions as depicted below[10]:



**How to use the event setup tool**

1.  Sign into your **Meta Ads Manager** account.

2.  Select **Events Manager** in the main menu.

3.  Click the 𝖠 **Data sources** icon on the left side of the page.

4.  Select the pixel you'd like to use.

5.  Click **Settings**.

6.  Select **Open event setup tool** under **Event setup**.

7.  Enter your URL and click **Open website**. The event setup tool will launch in your website browser.

8.  Click **Review** by each suggested event then select **Confirm** or **Dismiss**.

9.
    To add events that don't show up in your suggested list, navigate your website as usual to find the buttons or webpages you want. Select **Track new button** or **Track a URL** and follow the onscreen instructions.

    **Note**: When you set up an event on a button, you're adding the event to all buttons with the same or similar text on your website.

10. Select an event.

11. Set up parameters for your event.

*Figure 1*

currently operate on the Websites are as follows:  https://www2.cbn.com/ et. al.: 1566496390231749, 698416124465928, 959161807831459, and 973608176832448; https://secure.cbn.com/partners/video et. al: 1566496390231749, 698416124465928, 959161807831459, 973608176832448, 805092653288274, and 1639855849366172; https://www.cbnfilms.com/ et. al: 1566496390231749, 698416124465928, 959161807831459, 973608176832448, and 805092653288274; https://us-en.superbook.cbn.com/ et. al: 1639855849366172.

[10] Meta, *Use the Facebook Event Setup Tool for Web*, Meta Business Help Center (2024) https://www.facebook.com/business/help/777099232674791?id=1205376682832142 (last visited Feb. 6, 2024); Events websites can choose to track include: 'Subscribe', 'Add Payment Info', 'Search' and 'View Content' among others. *See* Meta, *Specifications for Meta Pixel standard events*, Meta Business Help Center (2024) Business Help Center https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited February 6, 2024).

9

25.     There is no reason a business *must* install the Pixel on its website – a Pixel does not facilitate any necessary website operations whatsoever. But embedding the Pixel within a website's code enables a business, like Defendant, to benefit from the collection of measurable data that details how users interact with their websites, such as whether users initiate purchases on the website, what items they view, and, relevant here, the content users request or obtain on a particular webpage.

**IV.     Defendant Invites Its Websites Visitors to Subscribe to the Video Service, and then Shares their PII with Meta.**

26.     Defendant invites users to become subscribers to its Websites by asking them to submit a valid email address and enter a display name or username (for free accounts), and to submit full names, addresses, and payment information (for CBN partner and Superbook partner accounts). Becoming a subscriber via any of the three access options affords access to exclusive content only available to subscribers.

27.     More particularly, Defendant offers three options to subscribe (or "partner" as Defendant calls it): (1) a Free Account, which gives users access to current CBN and CBN News episodes[11]; (2) a CBN Partner Account, which gives users access to additional "premium" movies and documentaries; and (3) a Superbook Partner Account, which gives users access to CBN's animated content for children.[12]

---

[11] Absent creating an account users would not have such access. The same is true for becoming a partner via the CBN Partner Account as well as the Superbook Partner Account.

[12] CBN FAMILY, *Access Options*, https://www.cbn.com/cbnfamily/access.aspx (last visited February 6, 2024).



*Figure 2*

### V.    How Defendant Discloses Subscribers' PII.

28.    When Defendant developed its Websites, it installed and programmed multiple Pixels.

29.    When a subscriber requests or obtains videos on Defendant's Website, the Pixels installed by Defendant send certain information about the subscriber to Meta, such as information identifying the audio-visual materials the subscriber requests or obtains. Specifically, Defendant sends to Meta the video content name, its URL, and the subscriber's FID.

30.    An FID is a unique and persistent identifier that Meta assigns to each of its users. With a user's FID in hand, Meta can locate the user's unique Facebook profile.[13] Simply put, with only an FID, the video content name, and the URL—all which Defendant knowingly provides to

---

[13] The process by which Meta can locate the unique user's Facebook profile is simple enough that any ordinary person can perform this task by entering the FID into the browser's search bar as detailed in Paragraph 37-38.

Meta—Meta can learn the identity of the subscriber and the specific video or media content he requests or obtains on the Websites.

31.    At all relevant times, Defendant knew the Pixels disclose PII to Meta. This is evidenced by, among other things, the inherent purpose and function of the Pixel, which is installed within a website to collect information about how users interact with a website.

32.    Defendant's knowledge of the Pixel is further evidenced by the fact that Defendant benefitted from the Pixel's because its Pixels enabled it to target digital advertising to its subscribers (and its potential subscribers) based on the content those subscribers previously requested or obtained on the Websites, including audio visual materials. Most importantly, Defendant knew the Pixels disclose PII to Meta because when Defendant installed the Pixel code within its webpage, *it selected the specific categories of data to share with Meta*.[14]

33.    Relevant here, Defendant, through the Pixels it installed within its Websites, disclosed to Meta both the video's title and the subscriber's FID in a single transmission. This transmission is depicted in the below example[15]:

---

[14] Meta, *Conversion Tracking*, Meta for Developers (2024) https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited February 6, 2024).

[15] For the purposes of demonstrating in this Complaint Defendant's practice of sharing consumers personally identifying information, an exemplary account for "Kendra Marta" was created and utilized.



*Figure 3*

34.    In this example, Defendant disclosed to Meta that Kendra Marta requested or obtained Defendant's audio visual material entitled "Model Student Overcomes Pornography Addiction."

35.    The FID is displayed as a numeric value referred to as the "c_user." In this example the numeric FID associated with Kendra Marta's Facebook profile is 100085022250478:



*Figure 4*

36.    The disclosure of the FID is coupled with the title of the audio visual material the subscriber requested or obtained along with the URL to access it:



*Figure 5*

37.    This transmission facilitates Meta's ability to specifically identify the user requesting or obtaining the video "Model Student Overcomes Pornography Addiction" because submitting "Facebook.com/100085022250478" into a browser's search bar, as demonstrated in *Figure 6*, will direct the browser to populate Kendra Marta's Facebook profile page., can be seen in *Figure 7*.



*Figure 6*



*Figure 7*

38.     Therefore, by entering https://www.facebook.com/[FID]/ Meta can identify the specific subscriber requesting or obtaining the audio visual content pertaining to, for example, issues of mental health[16], faith, or self-esteem – issues inherently personal to individuals seeking guidance from a confidential religious provider, such as Defendant. And furthermore, Meta uses this information to help businesses advertise their products to the specific individuals.

39.     The PII shared by Defendant is personal and unique to Plaintiff and each Class member, and Defendant's choices affect Plaintiff and Class Members' control of information concerning their person. "Most Americans hold strong views about the importance of privacy in their everyday lives,"[17] and 93% of adults believe it is important to have control over who can access information about them.[18]

40.     The VPPA establishes a right to privacy in U.S. citizens' PII regardless of the medium through which a video is requested or obtained. It imposes responsibilities video tape service providers, like Defendant, to limit disclosure of PII.

41.     Defendant violates the Video Privacy Protection Act by knowingly disclosing subscribers' PII to Meta in the form of their FIDs, together with the audio visual content they request or obtain.

**PLAINTIFF-SPECIFIC ALLEGATIONS**

42.     Plaintiff Tyler Stricker is a subscriber of Defendant's and has been since January of 2019. Plaintiff has a Free Account with CBN which gives him access to exclusive content not

---

[16] Meta, *About prohibited information*, Meta Business Help Center https://www.facebook.com/business/help/361948878201809?id=188852726110565 (last visited March 12, 2024).
[17] Mary Madden & Lee Rainie, *Americans' Attitudes About Privacy, Security and Surveillance*, Pew Res. Ctr. (May 20, 2015) *see also* EPIC, *Public Opinion on Privacy* (2018).
[18] *Id.*

otherwise available without subscription. Plaintiff Tyler Stricker has also been a Facebook user during the class period.

43.    Mr. Stricker requested or obtained video content solely available through his subscription from https://www2.cbn.com/ in the two years preceding the filing of this action.

44.    Plaintiff Stricker had a Facebook profile during the time he was a subscriber of Defendant's. Defendant disclosed to Meta his FID coupled with the title of the videos he requested or obtained and the URLs to access those videos.

45.    Each time Defendant disclosed his PII to Meta, it violated his rights under the VPPA.

## CLASS ALLEGATIONS

46.    Plaintiff brings this lawsuit under the Rules 23(a) and (b) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons in the United States who requested or obtained audio visual material through their subscription to Defendant's Websites, and had a Facebook Profile during the period any of the Pixels were active on Defendant's Websites.

47.    The "Class Period" is from March 27, 2022, to the present.

48.    Excluded from the Class is Defendant, any controlled person of Defendant, as well as the officers and directors of Defendant and the immediate family members of any such person. Also excluded is any judge who may preside over this cause of action and the immediate family members of any such person. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

49.    **Numerosity**: The Class consists of at least hundreds of individuals, making joinder impractical.

50.    **Commonality and Predominance**: Common questions of law and fact exist with regard to the claim and predominate over questions affecting only individual Class members. Questions common to the Class include:

A.    Whether Defendant knowingly disclosed Plaintiff's and Class members' PII to Meta;

B.    Whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and

C.    Whether Defendant should be enjoined from disclosing Plaintiff's and Class members' PII.

51.    **Typicality**: Plaintiff's claims are typical of the claims of the members of the proposed Class because, among other things, Plaintiff and members of the class sustained similar injuries from Defendant's uniform wrongful conduct, and their legal claims arise from the same events of wrongful conduct by Defendant.

52.    **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and Plaintiff has no interests antagonistic to those of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy-protection cases.

53.    **Predominance and Superiority**: Plaintiff satisfies the requirements of Rule 23(a) as well as the requirements for maintaining a class under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to individual plaintiffs is insufficient to make litigation addressing Defendant's conduct economically feasible in the

absence of the class action procedure. Individualized litigation also presents the potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

54.    **Injunctive Relief**: Plaintiff also satisfies the requirements for maintaining a class under Rule 23(b)(2). Defendant acted on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

55.    **Particular Issues.** Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

**CAUSE OF ACTION**
**Violation of the Video Privacy Protection Act**
**18 U.S.C. § 2710**

56.    Plaintiff incorporates and realleges paragraphs 1-55 by reference.

57.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifiable information" concerning any "consumer" to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

58.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the

business of delivering prerecorded audio visual materials and those sales affect interstate or foreign commerce.

59. As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged above, Plaintiff and Class members are subscribers to Defendant's service which delivers prerecorded audio visual content only available upon subscribing. Thus, Plaintiff and Class members are "consumers" under this definition.

60. As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

61. Defendant knowingly disclosed Plaintiff's and Class members' PII—specifically, their FIDs and the title and URL of the videos they requested or obtained—to Meta.

62. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and each Class member to Meta as having requested or obtained Defendant's video content, including the specific video materials requested or obtained on Defendant's Websites. Indeed, Meta (or anyone possessing a class member's FID) can identify the individual associated with it simply by entering "Facebook.com/[FID]" into a web browser.

63. Defendant never obtained from Plaintiff, or any Class member, informed, written consent. More specifically, Defendant never obtained from Plaintiff or any Class member, informed, written consent in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; Defendant never obtained from Plaintiff or any Class member, informed, written consent that, at the election of the consumer, was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or

until consent is withdrawn by the consumer, whichever is sooner; and Defendant never provided an opportunity, in a clear and conspicuous manner, for Plaintiff or any Class member to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

64.     Defendant's disclosures were made knowingly, as it programmed the Pixels into its Websites' code, knowing that doing so would disclose to Meta the video titles and the FIDs pertaining to any subscriber who requested or obtained a video.

65.     By disclosing Plaintiff's and the Class members' PII, Defendant violated Plaintiff's and Class members' statutorily protected right to request or obtain audio visual materials in private. 18 U.S.C. § 2710(c).

66.     Plaintiff and Class members have suffered loss by reason of Defendant's violations, including, but not limited to, violations of their right of privacy, loss of value in their personally identifiable information, and the inequity of Defendant's enrichment by means identifying information pertaining to Plaintiff and Class members without authorization or consent.

67.     As a result of these violations, Defendant is liable to Plaintiff and Class members.

68.     On behalf of himself and all members of the Class, Plaintiff seeks to enjoin Defendant's disclosures of PII; liquidated damages in the amount of $2,500 per violation; reasonable attorneys' fees and costs; and all other preliminary or equitable relief the Court deems appropriate. 18 U.S.C. § 2710(c)(2)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court:

i.     Certify this case as a class action, and appoint Plaintiff as Class Representatives and the undersigned attorneys as Class Counsel;

ii.     Find that Defendant's actions, as described herein, constitute violations of the VPPA;

ii.     Enter judgment in favor of Plaintiff and the Class;

iii.     Enter an order permanently enjoining Defendant from disclosing PII to third parties in violation of the VPPA;

iv.     Award Plaintiff and Class members the actual and/or statutory damages to which they are entitled under the VPPA;

v.     Award Plaintiff and Class members pre- and post-judgment interest as provided by law;

vi.     Award all costs, including experts' fees, attorneys' fees, and the costs of prosecuting this action; and

vii.     Award such other legal and equitable relief as the Court deems necessary and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable as of right.

Dated: March 28, 2024.

Respectfully submitted,

**BAILEY & GLASSER, LLP**

*/s/ Nicholas Johnson*
Nicholas Johnson (#76027)
njohnson@baileyglasser.com
Greg Porter (#40408)
gporter@baileyglasser.com
Jonathan Deem (#90260)

jdeem@baileyglasser.com
1055 Thomas Jefferson Street NW, Suite 540
Washington, DC 20007
Telephone: (202) 463.2101
Fax: (202) 463.2103

**CARNEY BATES & PULLIAM, PLLC**
James Allen Carney (*pro hac vice forthcoming*)
Attorney in Charge
1 Allied Drive
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505
Email: acarney@cbplaw.com